IN THE SUPREME COURT OF MISSISSIPPI
NO. 2000-KA-00347-SCT

*JOHN CURTIS MADERE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/18/2000 |
| TRIAL JUDGE: | HON. ROBERT WALKER |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | THOMAS D. BERRY, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | CONO A. CARANNA II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/13/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/4/2001 |

**BEFORE BANKS, P.J., SMITH AND EASLEY, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. This is a direct appeal from a judgment of conviction of forcible rape in the Circuit Court of Hancock County, Mississippi. The grand jury indicted John Curtis Madere ("Madere") a/k/a Rebel for the crime of forcible rape of Elizabeth Medina ("Medina") a/k/a Elizabeth Medina Summers. The court tried Madere before a jury. The jury returned a verdict which read, "We, the Jury, find the defendant guilty of Forcible Sexual Intercourse."

¶2. The trial court sentenced Madere to serve a term of fifteen years. It is from this conviction and sentence that Madere now appeals to this Court.

## FACTS

¶3. The record reflects that in September of 1998, Medina was a sixty-four (64) year old woman who lived alone in Hancock County, Mississippi, in a mobile home located in Bay Springs.[1] Madere was Medina's yardman and occasional handyman. Madere had done work for Medina for approximately six months. On the evening of September 17, 1998, Madere came to Medina's mobile home. Madere asked Medina if she could call her friend, Miss Doris, and tell her when Madere would be able to cut her grass. Madere asked to come inside the mobile home and use the bathroom. Madere came back from the bathroom and sat on a stool in front of the television. Madere asked Medina if he could watch the weather. Medina complied. Madere went to the bathroom again. When Madere came back from the bathroom, he found Medina had

gone into the kitchen to prepare some food.

¶4. Madere went into the kitchen. Medina testified at trial that Madere spun her around, kissed her, raised her blouse and bit her on her breast. She testified that she was dragged to the back of the trailer, crying and pleading, pulling on the wall to get away. Madere threatened her with his belt. Medina was thrown onto a mattress without box springs located on the floor of a spare room. Medina's legs were forced open. While on the mattress, Madere penetrated Medina's vagina with his penis. Medina could not remember whether Madere ejaculated. Medina was afraid Madere would kill her when he was finished.

¶5. Medina testified that she went into the bathroom after telling him she was wetting herself. Madere followed her into the bathroom where she sat on the commode naked. Madere came into the bathroom and asked her to put his penis in her mouth. Madere leaned over and told Medina, "I ought to put it in your mouth, shove it in your mouth."

¶6. Medina was afraid that she would get AIDS from Madere. They both cleaned up, and Madere left. After Madere left, Medina called Allen Seal and his wife, Barbara Seal, ("Seal"). Seal and her husband transported Medina to the Hancock Medical Center. Medina was treated at the Hancock Medical Center. Medina related the events to the nurses at the hospital. On September 18, 1998, Medina spoke to Officer Glen Strong at the Hancock County Sheriff's Department.

¶7. Nancy Struth ("Struth"), a registered nurse at Hancock Medical Center, examined Medina on September 17, 1998, in the emergency room. Struth testified that she generally makes a record of patient's activities and history, and accordingly, she made a record of Medina's activities and history. A narrative report was made regarding Medina. Based on the information gathered from Medina, a rape kit was performed on Medina at the hospital. Medina was hysterical, breathing very fast. Her blood pressure, pulse and respiration were elevated over the normal levels. Struth testified from the patient's record as follows:

> I wrote that it was possible sexual assault. Patient states she was raped. States she was -- states her yard -- wait a minute. States her yardman came into her house to use the restroom, then grabbed her from behind, pushed her to a back room, where he raped her. States there was vaginal penetration, and that man used his finger, sucked on her breast. Occurred approximately one hour prior to arrival. Patient crying hysterically. Stated I thought he was going to kill me. Patient taken to room 7 in Hancock. Deputy was here in the emergency room at that time and talking to the patient.

¶8. Susan Reihle ("Reihle"), a nurse at Hancock Medical Center, also examined Medina on September 17, 1998. Reihle also testified that Medina was crying and hysterical when seen at the hospital. Reihle assisted in performing the sexual assault kit on Medina. Reihle collected hair, body hair, and any kind of debris. The doctor performed a vaginal exam and collected the specimens. Evidence was collected from the patient and to find out if there was sexual assault. Reihle testified that each patient is interviewed to get a brief history of what happened. Reihle testified that the report gathered from Medina did not show any bite marks, tearing or bleeding. Medina was prescribed and given an antibiotic at the hospital and valium for home use.

¶9. According to Madere, besides cutting grass and doing a little maintenance work, he drew Social Security benefits (S.S.I.) for a mental disability and a deteriorating backbone. Madere began drawing Social Security in 1997. The truck Madere used in his yard and maintenance business was registered under Rebel Lawn Care. Madere had obtained his G.E.D. and had also taken a couple of college courses.

¶10. At the suppression hearing, Madere testified that he previously had been charged in Pearl River County with child molestation and further served thirty-nine (39) months in Michigan for burglary.

¶11. Madere was taken into custody on September 19, 1998. The rape alleged by Medina occurred on September 17, 1998. Madere was questioned by Officer Glen Strong ("Officer Strong") and Officer Kenneth Hurt ("Officer Hurt") at the Hancock County Sheriff's Department. Officer Strong was in charge of the questioning, and Officer Hurt acted as a witness. Madere came into the office with Officer Strong and Officer Hurt at 10:24 a.m. on September 19, 1998. Madere was given a voluntary statement form to read and sign advising him of his *Miranda* rights. Madere read and signed the voluntary statement form in front of Officer Strong and Officer Hurt. The tape recorded questioning that followed began at 10:49 a.m. (11 minutes until 11:00 a.m).[2] Madere claimed that he was threatened, beaten with a cane, forced to make his statement and told what to say. At the suppression hearing conducted by the trial court on the dates of January 7, 2000, and January 10, 2000, Madere made multiple allegations regarding his treatment at the sheriff's department. Madere alleged he was hit on the head and the shoulders with a cane. Madere also claimed that he was told that an inmate had been found hung in his cell and that if he did not cooperate they would tell that he had a prior child molestation charge in order to make it hard on him in prison.

¶12. Madere claimed he was shown the statute for rape and told what to say. Both Officer Strong and Officer Hurt denied all the allegations made by Madere. The typed transcript of the taped confession was thirty-two (32) pages long. The trial court overruled Madere's motion to suppress the statement he made to Officer Strong and Officer Hurt.

¶13. The tape of the confession was played to the jury, and the jury was given the prepared thirty-two (32) page transcript to help follow the tape. The taped statement stands in distinct contrast to Madere's testimony at trial. Pertinent excerpts of the thirty-two (32) page taped statement of the events are as follows:

> Madere: I went back to Miss Betty's trailer and knocked on the door it was late in the evening and I asked her, well when she come to the door I told her that I wanted to thank her for getting me the job up in Kiln and I asked her if she would contact Miss Doris and see if Miss Doris would let me cut it and pay me when she got the money... We was [sic] talking and I asked her if I can use her bathroom and she said yeah and so I went in and used the bathroom and when I come [sic] out she was sitting on the sofa watching tv [sic] the Weather Channel cause [sic] we had some bad weather and I asked her if I could sit down and watch it and she said yeah so I sat down and listened to and watched it and then we talked a little and she got up and went to the kitchen and checked on her food and she come [sic] back and sat down and she got a couple of phone calls and one of them was from Miss Doris and Miss Doris said I could just go ahead and cut the grass and she would pay me on the 1st or the 2nd when she got her check and then we talked a little more and she went back in the kitchen and I followed her in the kitchen and I lifted her shirt and bra and started kissing on her and kissing her on her titties and then she kept telling me no she didn't want to do that that I needed to leave and, and she couldn't do that cause she was sick she had just got out the hospital and then I kind of forcefully led her to that back bedroom there where she already had a mattress laying on the, on the ground and I took off the rest of her clothes and laid down, laid her down on the mattress and had sex with her and she kept crying and all saying she couldn't and all I told her I wasn't going to hurt her and when we got done I went in the bathroom and cleaned up and I went back in the living room and sat down for awhile and I kept trying to calm her down and she kept crying and then she got a phone call and

she answered the phone and she told me I better leave so I went ahead and left. I grabbed her by the arm and forcefully led her back to the back bedroom.

Strong: Was she trying to get away from you or resist or what?

Madere: Well she just didn't want to.

Strong: How do you know that?

Madere: Well she kept saying it and kept crying and she kept asking me to leave.

Strong: And she kept asking you to leave?

Madere: Yes sir.

Strong: Okay and where'd you take her?

Madere: To the back bedroom in the back of the trailer.

Strong: What happened next?

Madere: And then I took off her clothes and then I laid her on the bed and she kept saying she didn't want to and then, and then I raped her.

Strong: You raped her? Do you know what rape is?

Madere: Having sex with someone against their will.

Strong: Do you think that was against her will?

Madere: Yes.

Strong: Are you sure?

Madere: Yes sir.

Strong: How do you know that?

Madere: Cause [sic] she kept crying a lot and asking me to stop, asked me not to do it.

Strong: When you was taking her clothes off what was going on what did she say or what did you tell her or anything else?

Madere: Well she just kept saying that she couldn't have sex cause she had just got out of the hospital.

Strong: Was she saying it in a casual voice or what?

Madere: Well she was kind of like crying when she was talking.

Strong: And what did you tell her if anything?

Madere: I just told her that I was trying to be nice to her and reward her for getting me the job up in

[K]iln cause [sic] I was glad to get another grass cutting job.

Strong: So this was your way of rewarding her for helping you get a grass cutting job?

Madere: Yes sir.

Strong: And she kept telling you that she was sick and that she just got out of the hospital and she was crying and told you to leave and told you to stop and everything else and you had sex with her anyway?

Madere: Yes.

Strong: So she took your penis and inserted it in her vagina?

Madere: Yes sir, well directed it.

Strong: Directed it.

Madere: Yes.

Strong: Was she ugh [sic], laughing about it or what? Was she a willing participant?

Madere: No sir not really.

Strong: What do you mean, why would you say that?

Madere: She was crying and sobbing and stuff and saying she couldn't do it

Strong: Yeah, well did you ejaculate inside of her?

Madere: No sir.

Strong: Why not?

Madere: Cause [sic] she asked me not to come inside of her.

Strong: Well what did you do?

Madere: I pulled out right before I came, came on her belly.

Madere: Then I helped her up and we went in the bathroom and cleaned up and washed up with a wet wash rag and then I help her get back dressed.

Strong: And the whole time was she, now that after you had ejaculated on her belly ugh [sic], was everything okay with her now?

Madere: No sir she was still crying and told me I needed to leave.

¶14. Madere testified at trial completely contradicting his account of the forced sexual encounter in his earlier statement made at the sheriff's office. Madere testified that he had cut Medina's yard roughly a dozen times, hooked up her electric stove by rewiring it from a gas stove, repaired her breaker to stop it from

throwing and repaired a hole in Medina's bathroom floor. Medina's neighbor had arranged the introduction between Madere and Medina.

¶15. On September 17, 1998, Madere went to Medina's trailer to pick up some money owed to him for previous work done and also to find out about a job Medina had arranged for her friend, Miss Doris. That same day, Madere had gone out to Miss Doris's house to look at the yard, gave her a quote for the work, and set up a day to cut it to allow her time to get the money to pay him. On the way back home, Madere testified he decided to go back by Medina's trailer to get her to call Miss Doris and move up the job instead of waiting until she got her check.

¶16. Madere testified that it was around 9:00 p.m. on September 17, 1998, when he arrived at Medina's trailer. Medina's lights were still on inside the trailer. Medina and Madere talked at the door awhile. He told Medina that he had lined up the job with Miss Doris, but he wanted to tell her that he would like to move up the job. Madere needed Medina to call Miss Doris for him to pass along his message.

¶17. Madere asked if he could use Medina's bathroom. Medina allowed him to come inside the trailer. Madere testified that when he came out of the bathroom, Medina was lying on the sofa watching television. Madere sat on a stool across the room from Medina. Madere asked her to switch the channel so he could see the weather report. Medina complied. Madere testified that he did not remember if he went to the bathroom again. Medina had gone into the kitchen and was standing by the sink. Madere testified that he went up behind her and kissed the back of her neck.

¶18. Madere testified that they French kissed, and he slid his "hand under her blouse and bra and was playing with her titties and pulled them up, pulled her shirt and bra up, and kissed on her titties." He stated they walked from the kitchen to the back bedroom, and she laid down on a mattress on the floor. Madere testified he helped Medina undress, and she went to the bathroom. Medina was naked sitting on the commode. Madere testified that he was not aroused yet, so he followed Medina into the bathroom and "pulled out his peter and asked her if he could have a blow job, and she said no." Madere still had on his pants and shirt. Madere's testimony as to his version at trial of what happened after Medina came out of the bathroom is in striking contrast to his earlier statement given at the sheriff's department. Madere's testimony at trial in pertinent part was as follows:

> A. Well, I started kissing her some more, playing with her titties, reaching my hand down. I started rubbing her on the vagina. And I still wasn't getting aroused, so I placed her hand on my penis, and she started stroking it to get it aroused. And mean while I was kissing on her titties and all, getting her aroused. Her vagina started getting very wet and all, and then she finally got my penis aroused, and I crawled on top of her and asked her if she would please put my penis where she wanted it.

> Q. What did she do?

> A. She grabbed hold of it and directed it into her vagina.

> Q. Okay. And during this time, did you ever force her legs open?

> A. No, sir. No, sir. Not in the least bit.

> Q. Okay. So y'all had sex?

A. Yes, sir.

Q. And did she say anything to you while you were having sex?

A. Well, when we was almost finished, she did.

Q. What did she say?

A. She asked me please not to come inside of her.

Q. So what did you do?

A. I pulled out right at the last minute, sir, and ejaculated on her stomach, because that's what she wanted.

Q. All right. So after that was done, what did y'all do?

A. We walked in the bathroom. We cleaned up. She sat on the commode. I think she had to use the bathroom again. And I used the sink, asked her if I could use a wash rag that was on it. She said yeah. We cleaned up. She started getting dressed, and I helped her get dressed. And she couldn't find one of her socks. I had to go back in the bedroom, get one of her socks. Helped her put it on.

## STATEMENT OF ISSUES

**I. WHETHER SECTION 97-3-65 (3) OF THE MISSISSIPPI CODE OF 1972 ANNOTATED IS SO VAGUE, OVERBROAD AND CONFUSING THAT IT VIOLATED THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION?**

**II. WHETHER THE INDICTMENT UPON WHICH APPELLANT WAS CHARGED IS DEFECTIVE?**

**III. WHETHER THE LOWER COURT ERRED IN ALLOWING NURSE STRUTH TO TESTIFY TO HEARSAY THAT BETTY MEDINA TOLD HER "I THOUGHT HE WAS GOING TO KILL ME."?**

**IV. WHETHER IT WAS ERROR TO ALLOW THE PURPORTED VICTIM TO SIT BEHIND THE RAIL DURING CLOSING ARGUMENT AND SAY "LIAR"?**

**V. WHETHER THE VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE CREDIBLE EVIDENCE?**

**VI. WHETHER THE LOWER COURT ERRED BY ALLOWING THE PROSECUTION TO GO OUTSIDE THE EVIDENCE IN ITS FINAL ARGUMENT AND STATE MATTERS PREJUDICIAL TO APPELLANT?**

**VII. WHETHER THE LOWER COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENT?**

**VIII. WHETHER THE LOWER COURT ERRED IN REFUSING TO GRANT A MISTRIAL AFTER THE PURPORTED VICTIM FAINTED IN COURT?**

# LEGAL ANALYSIS

## I. CONSTITUTIONALITY OF MISS. CODE ANN. § 97-3-65(3)

¶19. Madere was indicted under Miss. Code Ann. § 97-3-65(3)(a) (2000) which came into effect July 1, 1998. Miss. Code Ann. § 97-3-65(3)(a) (2000) provides:

> Every person who shall have forcible sexual intercourse with any person, or who shall have sexual intercourse not constituting forcible sexual intercourse or statutory rape with any person without that person's consent by administering to such person any substance or liquid which shall produce such stupor or such imbecility of mind or weakness of body as to prevent effectual resistance, upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at imprisonment at the State Penitentiary for any term as the court, in its discretion, may determine.

Before the amendment effective July 1, 1998, Miss. Code Ann. § 97-3-65(2) (1997) provided as follows:

> Every person who shall forcibly ravish any person of the age of fourteen (14) years or upward, or who shall have been convicted of having carnal knowledge of any person above the age of fourteen (14) years without such person's consent, by administering to such person any substance or liquid which shall produce such stupor or such imbecility of mind or weakness of body as to prevent effectual resistance, upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment the court shall fix the penalty at imprisonment in the State Penitentiary for any term as the court, in its discretion, may determine.

¶20. Madere argues that the current statute § 97-3-65(3)(a) (2000) is vague on its face without any definition of the meaning of forcible and also unconstitutional in violation of the Fourteenth Amendment of the United States Constitution. Madere contends that "forcible sexual intercourse" is broad and vague in its meaning.

¶21. The previous statute used the words "forcibly ravish" which were replaced by "forcible sexual intercourse" in the statute adopted effective July 1, 1998. In order to set a definition of rape, some form of the word "force" was used in both the 1998 and the previous version of § 97-3-65. Miss. Code. Ann. § 97-3-65 (2) (1997); Miss. Code Ann. § 97-3-65 (3)(a) (2000).

¶22. "Statutes are presumed to be constitutional." *Vance v. Lincoln County Dep't of Pub. Welfare*, 582 So.2d 414, 419 (Miss. 1991). Vagueness is measured by whether men of common intelligence must necessarily guess at the meaning. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972). In order to prove the unconstitutionality of a statute, the unconstitutional grounds of the statute must be proved beyond a reasonable doubt. *Vance*, 582 So.2d at 419.

¶23. The key to testing "statutory construction" is whether a person of ordinary intellect would, by reading the statute, receive fair notice of that which is required or forbidden. *Reining v. State*, 606 So.2d 1098, 1103 (Miss. 1992).

¶24. Therefore, Madere bears the burden of showing that the word "forcible" makes § 97-3-65(3)(a) (2000) unconstitutional for being vague and overly broad. In the amended statute, § 97-3-65(3)(a) (2000),

"forcible" is used as an adjective to sexual intercourse. The previous statute, § 97-3-65(2) (1997), used the word "forcibly" as an adverb "to ravish." Miss. Code Ann. § 97-3-65(2) (1997); Miss. Code Ann. § 97-3-65(3)(a) (2000).

¶25. People of ordinary intelligence have the ability to understand what behavior "forcible sexual intercourse" is designed to discourage. The word "forcible" is no more vague or overly broad than "forcibly ravish." We find that the statutory purpose and meaning of the amended statute, § 97-3-65(3)(a) (2000), is purely common sense to any reasonable person.

¶26. Furthermore, this Court has repeatedly also held that resistance is not required for rape. In *Milton v. State*, 142 Miss. 364, 107 So. 423 (1926), this Court held that absence of resistance on account of fear caused by the assailant did not bar an attack from being rape. *See McQueen v. State*, 423 So.2d 800, 802 (Miss. 1982)(physical resistance is not required where the female yielded through fear under a reasonable apprehension of great bodily harm); *See also Rush v. State*, 301 So.2d 297 (Miss. 1974); *Fields v. State*, 293 So.2d 430 (Miss. 1974); *Johnson v. State*, 223 Miss. 56, 76 So.2d 841 (1955).

¶27. We find that Madere did not meet his burden of proof beyond a reasonable doubt to establish that the amended statute, § 97-3-65(3)(a) (2000), is unconstitutional. This issue is without merit.

## II. DEFECTIVE INDICTMENT

¶28. Madere argues that the indictment does not tract the statute Miss. Code Ann. § 97-3-65(3) (2000), and therefore, it is defective. Madere's indictment reads as follows:

THE GRAND JURORS of the State of Mississippi, taken from the body of the good and lawful citizens of Hancock County, duly elected, empaneled, sworn and charged to inquire in and for the said State and County, at the Term of Court aforesaid, in the name and by the authority of the State of Mississippi, upon their oaths present that:

JOHN CURTIS MADERE

in Hancock County, Mississippi, on or about September 17, 1998, did feloniously, unlawfully, wilfully and forcibly have sexual intercourse with Elizabeth Medina, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Mississippi.

¶29. Madere's argument is that he failed to be indicted under the language "forcible sexual intercourse" as shown in statute § 97-3-65(3) (2000), but instead the indictment states "forcibly have sexual intercourse." Madere also argues that the indictment failed to use the words "without her consent."

¶30. While Miss. Code Ann. § 97-3-65(3) (2000) has already been addressed in issue one by this Court, § 97-3-65(3)(a)-(b) (2000) states in pertinent part as follows:

(a) Every person who shall have forcible sexual intercourse with any person, or who shall have sexual intercourse not constituting forcible sexual intercourse or statutory rape with any person without that person's consent by administering to such person any substance or liquid which shall produce such

stupor or such imbecility of mind or weakness of body as to prevent effectual resistance, upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at imprisonment at the State Penitentiary for any term as the court, in its discretion, may determine.

(b) This subsection (3) shall apply whether the perpetrator is married to the victim or not.

¶31. A clear reading of the amended 1998 statute does not require the words "without consent" to be included in the indictment where force was involved. The pertinent part of the statute in question is stated as follows:

Forcible sexual intercourse with any person, or who shall have sexual intercourse not constituting forcible sexual intercourse or statutory rape with any person without that person's consent by administering to such person any substance or liquid which shall produce such stupor or such imbecility of mind or weakness of body as to prevent effectual resistance...

Miss. Code Ann. § 97-3-65(3)(a) (1998).

¶32. When the Mississippi Legislature amended statute § 97-3-65, it deleted the word "ravish" from the statute. Ravish is defined as having, "carnal knowledge of a woman by force and against her will; to rage." Black's Law Dictionary at 655 (5th d.). The requirement that there must be both force and lack of consent is no longer required under the amended statute, Miss. Code Ann. § 97-3-65(3) (2000).

¶33. In *Ousley v. State*, 154 Miss. 451, 122 So. 731-732, (1929), this Court held:

It is not essential, in an indictment for a statutory crime, that the exact descriptive language of the statute be used. Equivalent words of substantially the same meaning as those of the statute may be substituted. Where the language used in the indictment is sufficiently specific to give notice of the act made unlawful, and exclusive enough to prevent its application to other acts, it is sufficient.

This Court in *Westmoreland v. State*, 246 So.2d 487, 489 (Miss. 1971), stated the purpose of an indictment as the "pleading in a criminal case" is:

To apprise the defendant of the charge against him in fair and intelligible language (1) in order that he may be able to prepare his defense, and (2) the charge must be laid with sufficient particularity of detail that it may form the basis of a plea of former jeopardy in any subsequent proceedings.

¶34. "The formal and technical words of the statute are dispensable in an indictment." *State v. Snowden*, 164 Miss. 613, 145 So. 622 (1933). In *Snowden*, this Court further stated, "If the offense charged is certainly and substantially described in language equivalent in meaning to the language of the statute, it is sufficient."*Id*.

¶35. In the case sub judice, the indictment used the words "forcibly" rather "forcible" as used in the statute. We find that the intent of the statute was met in the indictment. Madere had the opportunity to determine what crime he was being charged with in the indictment. In *United States v. Wilson*, 884 F.2d 174, 179 (5th Cir. 1989), the Fifth Circuit stated:

The test of the validity of an indictment is "not whether the indictment could have been framed in a

more satisfactory manner, but whether it conforms to minimal constitutional standards." ***United State v. Webb***, 747 F.2d 278, 284 (5th Cir. 1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985). While a statutory citation cannot, standing alone, meet this test, a citation to the statute "reinforce[s] other references within the indictment." ***Campos-Ascencio***, 822 F.2d at 506, 508 (5th Cir. 1987); ***United States v. Varkonyi***, 645 F.2d 453, 456 (5th Cir.1981) (citation to statute in indictment "direct[s] the reader" to it). An indictment that tracks the words of a statute is not sufficient "unless those words of themselves fully, directly, and expressly, without any uncertainty of ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." ***Gordon***, 780 F.2d 1165, 1171 (5th Cir. 1986). However, "the law does not compel a ritual of words," and a recitation of the exact scienter ("knowing") is not required where the pleading "fairly imports" knowledge. ***United States v. Purvis***, 580 F.2d 853, 857-58 (5th Cir. 1978), *cert denied*, 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979); ***United States v. Arteaga-Limones***, 529 F.2d. 1183, 1199-1200 (5th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d. 286 (1976).

¶36. We find that this issue is wholly without merit. The indictment was not defective.

### III. HEARSAY

¶37. Madere argues that the trial court erred in admitting the hearsay testimony of Nancy Struth, emergency room nurse at Hancock Medical Center. Struth made a narrative report on September 17, 1998, regarding patient, Medina. At trial, Struth read from her report as follows:

> I wrote that it was a possible sexual assault. Patient states she was raped. States she was -- states her yard -- wait a minute. States her yardman came into her house to use the restroom, then grabbed her from behind, pushed her to a back room, where he raped her. States there was vaginal penetration, and that man used his finger, sucked on her breast. Occurred approximately one hour prior to arrival. Patient crying hysterically. Stated I thought he was going to kill me. Patient taken to room 7 in Hancock. Deputy was here in the emergency room at that time and talking to the patient.

¶38. On appeal, Madere argues specifically as to the statement by Medina that, "I thought he was going to kill me." Prior to Struth testifying, Madere objected to any testimony outside of medical history. The trial court allowed the testimony.

¶39. M.R.E. 803(4) provides for the admissibility of a statement for purpose of medical diagnosis or treatment. Rule 803(4) reads as follows:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or what the statements are made, or when the statements are made, if the Court, in its discretion, affirmatively finds that the proffered statements were made under circumstances substantially indicating their trustworthiness. For purposes of this rule, the term "medical" refers to emotional and mental health as well as physical health.

¶40. Rule 803(4) is an exception to the hearsay rule even though the declarant is available as a witness. ***Bailey v. State***, 729 So.2d 1255, 1262 (Miss. 1999). In order to allow hearsay under M.R.E. 803(4), the

declarant's motive in making the statement must be consistent with the purposes of promoting treatment and the content of the statement must be such as is reasonably relied on by a physician in treatment. ***Johnson v. State***, 666 So.2d 784, 795 (Miss. 1995). *See **Doe v. Doe***, 644 So.2d 1199, 1205-06 (Miss. 1994). Medical for purpose of Rule 803(4) includes emotional and mental health as well as physical health. M.R.E. 803(4); ***Hall v. State***, 611 So.2d 915, 921-22 (Miss. 1992).

¶41. M.R.E. 803(2) further provides an exception to the hearsay rule for excited utterances even though the declarant is available to testify as a witness. M.R.E. 803(2) provides as follows:

> Excited Utterance. A statement relating to a starling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

¶42. The comment to Rule 803(2) states that the reliability of an exited utterance is based on the premise that circumstances may place the declarant in such an excited state as to temporarily impede the capacity for reflection. *See **Clark v. State***, 693 So.2d 927, 931-32 (Miss. 1997); ***Davance v. State***, 768 So.2d 319, 322-23 (Miss. Ct. App. 2000).

¶43. Medina reported that she had been raped when brought into the emergency room. Struth, as well as Reihle, testified that Medina was hysterical when she was brought into the hospital. The nurses followed normal hospital procedure and obtained a brief history of what happened to Medina and collected a rape kit based on the history Medina gave to the hospital.

¶44. We find that the statement made by Medina gathered during her medical examination was properly admitted as an exception to the hearsay rule pursuant to both M.R.E. 803(2) & (4). This issue is without merit.

## IV. CLOSING ARGUMENT

¶45. Madere argues that the trial court erred in overruling his motion for a mistrial when Medina said, "Liar, " once during closing argument. The outburst occurred during the defense's closing argument[3] Medina was in the audience at the time of her outburst.

¶46. The trial court reserved ruling on the motion for mistrial until after closing arguments were concluded and the jury had been removed from the courtroom. The trial court stated in front of the jury, "Any further comment, outside the courtroom." In ruling on the motion for mistrial, the trial court stated, "The court is of the opinion that the objection does not rise to any level of prejudice that would require a mistrial."

¶47. It is a well-settled rule in this State that a finding of mistrial is reserved for those instances where the trial court cannot take any action which would correct improper occurrences inside or outside the courtroom. ***Walker v. State***, 671 So.2d 581, 621 (Miss. 1995). "[T]rial judges are peculiarly situated so as to decide (better and more logically than anyone else) when a trial should be discontinued." ***Davis v. State***, 530 So.2d 694, 697 (Miss. 1988), (citing ***Schwarzauer v. State***, 339 So.2d 980, 982 (Miss. 1976)).

¶48. In ***Chase v. State***, 645 So.2d 829, 848-49 (Miss. 1994), during the guilt phase of the trial, the victim's widow took the stand and began crying as she described her husband's murder. This prompted other family members in the audience to begin crying as well. ***Id***. Defense counsel made an objection for mistrial which the trial court overruled. ***Id***. This Court stated that the:

Trial judge is in a better position to access the effect of such an incident than is this Court on appeal, and this Court will not reverse on the failure to grant a mistrial unless a trial judge abused his discretion in overruling the motion for a mistrial.

*Id*. at 848 (quoting *Ladner v. State*, 584 So.2d 743, 753 (Miss. 1991)).

¶49. In *Floyd v. State*, 166 Miss. 15, 148 So. 226, 232 (1933), this Court further held as follows:

As long as an audience does not disturb or prevent a fair trial, we cannot control the lower court in its discretion, and tell it when to exercise authority and when not. It is only when it is evident that such authority should be exercised, and is not, that this Court will interfere.

¶50. Here the trial court immediately restored order to the courtroom and admonished Medina of the impropriety before any jury and that any further outbursts would result in her removal from the courtroom. We find that this issue is without merit. If any error exists assuming arguendo, it is harmless error. The trial court immediately admonished Medina, and no other outburst occurred.

## V. VERDICT CONTRARY TO THE OVERWHELMING WEIGHT OF THE CREDIBLE EVIDENCE

¶51. Madere argues that the verdict was against the overwhelming weight of the evidence. Madere bases his argument on the fact that the jury took over eight hours to deliberate, the lack of investigation done by the officers and the inconsistencies in Medina's testimony with her prior statements. However, Madere's argument on appeal focuses primarily on the inconsistencies in Medina's statements. Besides her testimony at trial, Medina also gave an account of the events in question to Seal; the nurses at the hospital, Struth and Reihle; and Officer Strong.

¶52. Madere claims on appeal that Medina's whole story was a total fabrication. Madere points out that at trial Medina could not recall whether Madere had French kissed her. In a previous statement, Medina stated that her mouth smelled like smoke because Madere put his tongue in her mouth. Medina testified at trial that Madere bit her breast in contrast to her previous statements that Madere had sucked her breasts.

¶53. This Court has held that "the motion for a new trial is addressed to the sound discretion of the trial court."*Burge v. State*, 472 So.2d 392, 397 (Miss. 1985). The credible evidence consistent with [a defendant's] guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993). *See Van Buren v. State*, 498 So.2d 1224, 1228 (Miss. 1986). This Court stated it "will reverse only when it is convinced that the trial judge has abused his discretion." *Malone v. State*, 486 So.2d 360, 366 (Miss. 1986); *Quinn v. State*, 479 So.2d 706, 710 (Miss. 1985).

¶54. Seal testified at trial on direct examination for the defense. Seal had known Medina since 1963. Medina had called Seal's home on the night of September 17, 1998. Seal's husband, Allen Seal, handed Seal the phone to talk to Medina. Medina was hysterical, and Seal could not understand Medina on the phone. Seal and her husband immediately went to Medina's trailer to see what was wrong with her. Seal stated that all she could determine was that something bad had happened to Medina.

¶55. Seal testified that Medina told her that the young man that cut her grass had knocked on her door and

told her he needed to used the bathroom. Medina told Seal that Madere went to the bathroom and the next thing she remembered was that she was lying on the bed in the back room with her body half on and half off the bed. Madere was in the bed. Medina told her that Madere raped her and did more stuff to her. Seal testified that Medina said she was frightened of him, but he did not use any weapon on her. Seal recounted that Medina told her that they went into the bathroom and cleaned up together. Seal, along her husband, Allen, and his friend, Frank Summers and her neighbor, Alton Gray, transported Medina to the hospital.

¶56. Both, Struth and Reihle, described Medina as being hysterical when brought to the hospital. The hospital report indicated that Medina had stated that Madere had sucked on her breast. Medina testified at trial that Madere had bitten her breast. No bruises, tears, bleeding or bite marks were documented. The doctor notes in the report documented no semen was found inside Medina.

¶57. Medina had been questioned by Officer Strong as to the events on September 17, 1998. Officer Strong testified that in her statement Medina stated that Madere had sucked on her breast. He did not recall that Medina stated that Madere bit her breast. Officer Strong did not have any documented observation of any tears, bruises or bite marks. Officer Strong testified that he never examined the clothing.[4]

¶58. All of the witnesses who observed or treated Medina on the night of September 17, 1998, agreed that Medina was hysterical. Medina never stated that the sexual encounter was consensual in any statement or at trial. Medina never recanted her allegations. Madere focuses on appeal on Medina's inconsistencies between her testimony and statements. However, Madere's own testimony at trial as to the sexual encounter is a complete contradiction of his earlier statement he had given to Officer Strong and Officer Hurt. The jury was presented all the evidence in this case and deliberated for over eight hours. The jury did not rush to judgment.

¶59. In *Benson v. State*, 551 So.2d 188, 193 (Miss. 1989), this Court held that factual disputes are properly resolved by the jury in a criminal prosecution and do not mandate a new trial. The jury is the trier of witness credibility. *Collier v. State*, 711 So.2d 458, 462 (Miss. 1998). Jurors are permitted to and have a duty to resolve conflicts in testimony they hear. *Groseclose v. State*, 440 So.2d 297, 300 (Miss. 1983); *Gandy v. State*, 373 So.2d 1042, 1045 (Miss. 1979). "[Jurors] may believe or disbelieve, accept or reject, the utterances of any witness." *Grady*, 373 So.2d at 1045. There is no formula that dictates the jury's decision in resolving conflicts in testimony of the witness. *Id*.

¶60. We find that the facts presented at trial in the case sub judice are sufficient to support the finding by the jury that a rape had occurred. The argument that the verdict was against the great weight of the evidence and contrary to the law is totally without merit.

## VI. PROSECUTION'S CLOSING ARGUMENT

¶61. Madere alleged at the suppression hearing that Officer Strong hit him with a wooden cane and coerced his statement. Madere argues that the State improperly argued in closing argument that Officer Strong was dying of cancer. On appeal, Madere alleges that he was physically coerced by Officers Strong and Hurt into giving a confession. Madere contends that the State was allowed to go outside the evidence and inform the jury on close that Officer Strong was dying of cancer, and he was physically unable to hit Madere with a wooden cane. Madere's attorney made an objection and motion for mistrial. The trial court denied the mistrial. The following transpired on the record:

> State: Glen Strong has had to retire from the Sheriff's office because he is dying of cancer. Beat this guy up so bad he gave a confession.
>
> Defense: Which we object to that, because he is dying of cancer.
>
> State: Kenny Hurt.....
>
> The Court: Wait a minute, wait a minute
>
> Defense: I'm making an objection your honor.
>
> The Court: Go ahead
>
> Defense: There is no testimony that he is dying of cancer. Just that he was sick
>
> The Court: The jury will recall the testimony
>
> Defense: I would ask the Court for a mistrial, and also, I would ask the Court instruct the jury to disregard that comment.
>
> The Court: The jury will recall what the testimony was, continue.

¶62. The trial court instructed the jury to recall the testimony of Officer Strong as to whether he testified that he was dying of cancer. This Court has held that attorneys are allowed wide latitude in closing arguments. *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998). In addition, the "court should also be very careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to [a] jury." *Ahmad v. State*, 603 So.2d 843, 846 (Miss. 1992). Any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration. *Id*. The "trial judge is vested with discretion to determine whether a comment during closing argument is so prejudicial that mistrial should be declared." *Alexander v. State*, 602 So.2d 1180, 1182 (Miss. 1992).

¶63. Here Madere's attorney objected to the comment in closing argument about Officer Strong's condition. Counsel objected on the basis that the information was a matter not in evidence, but rather information that Officer Strong had testified to regarding his health at the suppression hearing. The trial judge sustained the objection. If sustaining the objection alone is considered to be inadequate to remove the alleged prejudicial effect of the objected matter from the minds of the jury, then the court must be requested to instruct the jury to disregard the matter. *Anderson v. Jaeger*, 317 So.2d 902, 906 (Miss. 1975). As a general rule, the jury is presumed to understand that the court disapproves of any testimony when an objection is sustained. *Estes v. State*, 533 So.2d 437, 439 (Miss. 1988); *Davis v. State*, 472 So. 2d 428, 433 (Miss. 1985). Madere's counsel objected to the comment, and the trial court sustained the objection. The trial court also instructed the jury to disregard the matter and recall Officer Strong's testimony at trial. We find that this issue is without merit.

## VII. SUPPRESSION OF MADERE'S STATEMENT

¶64. Madere contends that his tape-recorded statement made to Officer Strong was not voluntary and should not be admissible as the product of a cross-examination which suggested answers. Madere also contends he suffered from diminished mental capacity, thereby, limiting his ability to withstand the threats and coercion.

¶65. This Court has held that a defendant's mental abilities are but "one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made." *McGowan v. State*, 706 So.2d 231, 235 (Miss. 1997); *Neal v. State*, 451 So.2d 743, 756 (Miss. 1984). The trial judge must determine from the "totality of the circumstances" whether there was an "intelligent, knowing and voluntary waiver."*McGowan*, 706 So.2d at 235; *Neal*, 451 So.2d at 753. In *Hunt v. State*, 687 So.2d 1154, 1160 (Miss. 1996), this Court held that a defendant/appellant bears a heavy burden in attempting to reverse a trial judge's unfavorable ruling on a motion to suppress. The determination of whether a statement should be suppressed is made by the trial judge sitting without a jury as the finder of fact. *Id*. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence."*Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992); *Palm v. State*, 748 So.2d 135, 142 (Miss. 1999). In other words, this Court has held that it will not reverse a trial court's "finding that a confession was voluntary and admissible as long as the trial judge applies the correct principles of law and the finding is factually supported by the evidence." *Palm*, 748 So.2d at 142. *See Greenlee v. State*, 725 So.2d 816, 826 (Miss. 1998)(citing *Haymer v. State*, 613 So.2d 837, 839 (Miss. 1993)). "Where, on conflicting evidence, the court makes such findings, this Court generally must affirm." *Lesley v. State*, 606 So.2d 1084, 1091 (Miss. 1992). *See also Dancer v. State*, 721 So.2d 583, 587 (Miss. 1998) (citing *Morgan v. State*, 681 So.2d 82, 87 (Miss. 1996)).

¶66. The trial court conducted a lengthy suppression hearing on January 7, 2000, and January 10, 2000. The trial court overruled the motion to suppress the statement. At the suppression hearing, the trial court heard testimony from Officer Strong, Officer Hurt, and Madere before making a ruling on the suppression.

¶67. Madere testified he drew Social Security benefits for mental disability and a deteriorating backbone. However, Madere also testified that he had obtained his G.E.D. and attended some college courses. Madere also operated a maintenance and lawncare business under the name of Rebel Lawn Care, in addition to drawing his Social Security benefits, to supplement his income.

¶68. According to Madere's testimony at the suppression hearing, he had prior dealings and involvement with law enforcement on other charges. This was not Medina's first brush with the law or his first time being arrested. Madere testified that he had previously been charged with child molestation and served thirty-nine (39) months for burglary. Madere was asked at the suppression hearing, "Did your mental condition have anything to do with your giving this statement?" Madere responded by saying, "I'm not sure." Madere could not definitely confirm that his alleged mental deficiencies caused him to give a statement to the officers.

¶69. Madere also alleged that he had been threatened with the fact there had been a hanging in that jail. Madere denied that he knew any circumstances of the hanging or that Officers Strong and Hurt had any connection with the hanging. Madere claims on appeal that the hanging is undisputed. However, the record does not clearly reflect that Madere's claim was substantiated or confirmed.

¶70. Madere further alleged at the suppression hearing that Officer Strong had threatened him with a cane. Officer Strong did not deny that a cane may have been in the office. However, Officer Strong testified he had a vertebra collapse and probably still had the cane in his office. Officer Strong further testified that he shared an office with Officer Hurt. He believed Officer Hurt was working a case that involved a stolen walking cane. Officer Strong was not positive of the location of that cane or whether it had been in the office. Officer Strong and Officer Hurt both denied that any force, coercion, coaching or threats were used

against Madere to obtain the statement. The statement was tape recorded and transcribed. Officer Hurt acted as a witness to the questioning conducted by Officer Strong.

¶71. The trial court heard testimony from Madere, Officer Strong and Officer Hurt at the suppression hearing. The trial court, as the fact finder, determined the statement by Madere should not be disallowed. The officers testified that no one had hurt, threatened, promised anything to Madere or coerced him to make a statement. A voluntary statement of rights was signed by Madere before the tape recorded statement was made. The tape recorded statement did not indicate any sounds of threat or coercion. We find that, the trial court's finding was not manifestly wrong or clearly erroneous nor was the wrong legal standard applied. Madere has not met the burden of establishing that the trial judge abused his discretion in denying the motion to suppress. This issue is without merit.

## VIII. MISTRIAL

¶72. During cross-examination by Madere, Medina stated that she was getting dizzy. The trial court excused the jury to the jury room immediately when the court discovered Medina had become dizzy. The trial court made a description of what was observed as a part of the record. The record reflects the following:

> The witness laid back in her chair and her eyes were closed, and she was very quiet. She was silent. I don't [sic] know if she passed out or not, but it did appear to look that way for a moment. Then she begun to shake and cry. And the court immediately directed the jury to go back into the jury room, and the bailiff began to attend to her and gave her a wet paper towel.

> After the jury left the courtroom, the court allowed her husband and son to attend to her. That was not in the presence of the jury.

¶73. The trial court allowed the attorneys to add to the description, if they desired. The attorneys agreed with the trial court's description. The trial court reserved ruling on Madere's motion for mistrial. The trial court reserved ruling to see if there would be redirect by the State the next day. The next day, the State did not choose to have any further redirect. In overruling the motion for mistrial, the trial court stated:

> The court is going to overrule the defendant's motion for a mistrial. The testimony of Miss Sumners (Medina) yesterday, the entire testimony was rather emotional and hotly charged, and especially cross-examination. And this just was another emotional issue the jury was able to view regarding her testimony. I don't think it was so dramatic or left such an impression on the jury that would rise to the level of prejudice or which would require a mistrial. So your motion is noted. It is overruled.

¶74. In *Brent v. State*, 632 So.2d 936, 941 (Miss. 1994), this Court held that "the decision to declare a mistrial is within the sound discretion of the trial judge." *See Arizona v. Washington*, 434 U.S. 497, 512-13, 98 S.Ct. 824, 834, 54 L.Ed. 2d 717 (1978). In order for there to be error as a result of the trial judge's failure to grant a mistrial, there must be an abuse of discretion. *Brent v. State*, 632 So.2d at 941. *See Jones v. State*, 398 So.2d 1312, 1318 (Miss. 1981). "The granting of a motion for mistrial is within the sound discretion of the trial judge." *Hoops v. State*, 681 So.2d 521, 528 (Miss. 1996).

¶75. Medina was an elderly lady being asked questions of the most personal nature. Medina stated that she was dizzy in front of the jury. The trial court promptly removed the jurors from the courtroom. The trial court made a record of what transpired. The court recessed until the next morning to proceed with the case.

Medina was visible in the audience at the close of the case. The jury was not left wondering what had happened to Medina or wondering if she had died as alleged by Madere on appeal. The trial court was in the best position to determine whether an objectionable remark had any prejudicial effect or impact on the jury and whether a mistrial was appropriate. *See **Mills. v. State***, 763 So.2d 924, 928-29 (Miss. 2000). We find that the trial court viewing the matter first-hand, was satisfied that no prejudice had resulted to Madere. Nothing in the record convinces this Court that the trial court erred. This issue is without merit.

## CONCLUSION

¶76. For all the foregoing reasons, the judgment of the Hancock County Circuit Court is affirmed.

¶77. **CONVICTION OF FORCIBLE RAPE AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**BANKS AND McRAE, P.JJ., SMITH, MILLS, WALLER, COBB AND DIAZ, JJ. CONCUR. PITTMAN, C.J., CONCURS IN RESULT ONLY.**

1. Medina had married Frank Summers after September, 1998.

2. The transcript from the suppression hearing went into exhaustive detail that Officer Strong incorrectly wrote down the time as 10:11 a.m. on the report instead of the correct time, 10:49 a.m.

3. Madere's attorney stated that Medina had stared at Madere's belt and looked right at his crotch and then made remarks. Madere testified that Medina had noticed Madere's wolf-belt buckle and told him she would try to make him a fox at ceramics class.

4. Medina's clothing had been packaged by the hospital and mailed to the crime lab.